```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3     ---------------------------)
       DORIS BERROCAL, and others )  Case No.
 4     similarly situated         )  07-22549-CIV-UNGARO/SIMONTON
                                  )
 5                  Plaintiffs,   )
                                  )
 6          - versus -            )
                                  )
 7     MOODY PETROLEUM, INC.,     )
       DORCLA, INC., Florida      )
 8     Corporations, and CLAUDE   )
       P. DORMOY, individually,   )  Miami, Florida
 9                                )  February 24, 2009
                    Defendants,   )
10     ---------------------------)

11

12                TRIAL TESTIMONY OF CLAUDE P. DORMOY
                BEFORE THE HONORABLE ANDREA M. SIMONTON
13                   U.S. MAGISTRATE JUDGE
                          and a Jury
14

15     A P P E A R A N C E S:

16

       For the Plaintiffs:     EDDY O. MARBAN, ESQ.
17                             782 NW Le Jeune Road #350
                               Miami, Florida  33126
18

19     For the Defendants:     DOUGLAS E. EDE, ESQ.
                               1501 Venera Avenue, #201
20                             Miami, Florida 33146

21

22

23     Reporter:               Richard W. Barry, RPR
                               Official Court Reporter
24                             (516)317-5133

25
```

```
 1              THE COURT:  You can call your first witness.

 2              MR. MARBAN:  I call Mr. Dormoy to the stand.

 3              THE COURT:  Mr. Dormoy, if you come over here and just

 4    take the witness stand.  My Courtroom Deputy will place you

 5    under oath.

 6    C-L-A-U-D-E   D-O-R-M-O-Y, having been fist duly sworn, took the

 7    stand and testified as follows:

 8              THE COURT:  Thank you.

 9              Mr. Marban, you can proceed.

10              MR. MARBAN:  Thank you, Judge.

11    DIRECT EXAMINATION BY MR. MARBAN:

12    Q    I want to speak about Dorcla, Inc. first.  Were you one of

13    the owners of the defendant corporation, Dorcla, Inc.?

14    A    I was the owner, yes.

15    Q    And was that an Amoco BP gas station?

16    A    Yes.

17    Q    Where was that gas station located?

18    A    On Eureka Drive and South Dixie Highway.

19    Q    That is 184th Street, correct?

20    A    Exactly.

21    Q    Does the gas station have a store inside of it?

22    A    Yes.

23    Q    And did you own Dorcla, Inc. from 1994 through

24    approximately 2006?

25    A    Yes.
```

Marban - Direct - Dormoy                            3

```
1   Q    Do you recall the date when the gas station closed, being
2   June or July of 2006?
3   A    It was exactly May 31, 2006.
4   Q    Do you have anything that helps you-- are you so certain
5   that it was May 31st of 2006?
6   A    Because when I had to be closed, I turned it over to BP and
7   they came and picked it up, took over the first of June.
8   Q    But is there anything in particular that helps you recall
9   the exact date when it did close?
10  A    Well, what I recall exactly is that, if I go one more
11  month, I would have to pay the whole rent.  So it was very
12  convenient for me to close it on the 31st.
13  Q    Well, do you remember filing papers with the Secretary of
14  State in April of 2006, the month before?
15  A    That's for the--
16  Q    Yeah--
17  A    The annual registration.
18  Q    Yes?
19  A    Yes.
20  Q    You did that the month before in April?
21  A    Yes.
22  Q    Do you have any paperwork that would establish the exact
23  date when you closed the store?
24  A    Yes.
25  Q    What is that paperwork?
```

Marban - Direct - Dormoy                                    4

```
1    A    It is the paper that the BP signed taking over the station.

2    Q    But you don't have that paper here with you today?

3    A    No, I didn't bring it.

4    Q    You've never given that to your attorney so he could give

5    that paper to me?

6    A    I was not asked for it.

7    Q    Now, the Dorcla, did it have-- how many days a week was it

8    open?

9    A    Seven days.

10   Q    How many hours a day was it open?

11   A    24.

12   Q    It had three different shifts?

13   A    Three shifts, yes.

14   Q    One in the morning, one in the afternoon and one at night?

15   A    Exactly.

16   Q    Do you recall Ms. Berrocal worked at Dorcla at sometime?

17   A    Yes, she did.

18   Q    She was an employee of Dorcla?

19   A    Yes, she was.

20   Q    You don't have any records of when she worked there?

21   A    I don't have any now.

22   Q    I did ask you for those records, those records, I did ask

23   you for, do you remember?

24   A    Yes.  Yes.

25   Q    At Dorcla, Inc., did you use to keep records of the hours
```

Marban - Direct - Dormoy                                    5

1    that the employees worked?

2    A    I used a schedule.

3    Q    But didn't you use to write down in a piece of paper the

4    hours that employees worked at Dorcla?

5    A    I used the schedule to pay the employees.  If it is

6    something different they would tell me.

7    Q    Didn't you prepare what you refer to as a shift report

8    that --

9    A    Yes.

10   Q    When employees wrote the hours?

11   A    Yes, there was a shift report, yes.

12   Q    A shift report, the employees would write the hours that

13   they worked or the manager, the cashier would write the hours

14   that the employees worked, correct?

15   A    Correct.

16   Q    And, that shift report with the hours for the employees,

17   you no longer have that?

18   A    No, for Dorcla, no.

19   Q    You destroyed that, correct?

20   A    I took it to my garage when the station closed down and it

21   got wet during the hurricane, I don't have it.

22   Q    Do you recall ever destroying records, time records for

23   either Dorcla or Moody?

24   A    No.

25   Q    You never destroyed records?

1   A    Destroyed, no.

2   Q    You remember coming to my deposition and giving your

3   testimony-- coming to my office and giving your deposition under

4   oath?

5   A    Are you talking about the time sheet report?

6   Q    Yes, sir.

7   A    Yes.

8   Q    Yes, sir?

9   A    I destroyed them after.

10  Q    You destroyed them?

11  A    After I do the whole schedule, yes.

12  Q    And sir, weren't you aware that the Fair Labor Standards

13  Act requires that you keep time records?

14  A    I have time sheet that the employee signs.

15  Q    But, there is a difference between a time sheet and a time

16  record, because according to what you told me before, you would

17  take the time records and from those time records, you would

18  create a time sheet; isn't that correct?

19  A    Yes.

20  Q    But the actual time records, which contained the

21  handwritten notations written either by the employee or the

22  cashier, those records you no longer have?

23  A    No, I don't have it, no.

24  Q    And for Mrs. Berrocal, even the time sheets that you made

25  reference to, you no longer have those records, correct?

Marban - Direct - Dormoy                                7

1   A    No.

2   Q    Are those the ones that you destroyed or are those the ones

3   that got wet with the hurricane?

4   A    The ones that got wet were from Dorcla.

5   Q    They got wet?

6   A    Yes.

7   Q    And, you also have no records for her from Moody Petroleum,

8   correct?

9   A    No.

10  Q    Those you destroyed?

11  A    She wasn't on time sheet.

12  Q    But, you didn't keep time records for her then at Moody

13  Petroleum, is that what you are saying?

14  A    No.

15  Q    And you didn't keep any records of the hours that she

16  worked at Moody Petroleum?

17  A    No.

18  Q    And you also paid her in cash, didn't you?

19  A    Yes.

20  Q    So, there were no paychecks that show the actual hours that

21  she worked at either store?

22  A    No.

23  Q    You paid her cash at both Moody and Eureka, correct?

24  A    Yes.

25  Q    Now, you're also part owner of Moody Petroleum?

1   A    Part owner, yes.

2   Q    You are the president of Moody Petroleum?

3   A    Yes, I am.

4   Q    And Moody Petroleum is still in business?

5   A    Still, yes.

6   Q    And Moody is also a BP Amoco gas station isn't it?

7   A    Yes.

8   Q    Now, Moody Petroleum is a slightly larger store, right?

9   A    Yes.

10  Q    It has a-- it has a mini market inside?

11  A    Yes, a Korean store, yes.

12  Q    Also has a cafeteria inside?

13  A    Yes, a small cafeteria, yes.

14  Q    Where is Moody Petroleum located?

15  A    It is 36790 South West 137th Avenue, Naranja.

16  Q    You purchased Moody in the year 2000?

17  A    Yes.

18  Q    And in 2007, you still had Moody Petroleum, you were still

19  operating that store?

20  A    Yes, sir.

21  Q    And how many days a week is Moody Petroleum open?

22  A    Seven.

23  Q    24 hours?

24  A    24 hours.

25  Q    In addition to the Moody gas station and the Eureka or

```
 1   Dorcla gas station, did you also own another gas station named
 2   Super Stop, Inc.?
 3   A     Yes.
 4   Q     And you owned that Super Stop, Inc. gas station since 1997?
 5   A     No, since 2002.
 6   Q     You didn't acquire it in the year 1997?
 7   A     That was another station.  That was same company, but
 8   another station.
 9   Q     Were you associated with Super Stop in 2007-- I'm sorry,
10   1997?
11   A     Yes.
12   Q     You were running that store, weren't you?
13   A     Yes.
14   Q     So, it is fair to say that you have had years of experience
15   running gas stations; is that correct?
16   A     Yes.
17   Q     And, you also, you are also familiar with a law that
18   requires that employees be paid overtime; isn't that correct?
19   A     Yes, I am.
20   Q     When you were running and operating the three gas stations
21   that I referred to, you knew that employees that work more than
22   forty hours a week had to be paid overtime didn't you?
23   A     Yes.
24   Q     And all those years, that you owned those three gas
25   stations that I talked about, you never paid any of your
```

1   employees overtime wages?

2   A     No.

3   Q     Isn't it true that sometimes employees would have to cover

4   a shift for another employee?

5   A     When it happens, it is changed around.  Like somebody

6   suppose to work on Thursday, somebody needs Wednesday off, they

7   change.

8   Q     So, there were occasions when employees were required to

9   work additional hours during the week?

10  A     What do you mean "additional"?

11  Q     Well, if one employee called in sick or wanted the day off,

12  another employee would have to cover?

13  A     Well, most of the time I did cover with my wife and my

14  kids.

15  Q     So, you are trying to tell me that you never had in the

16  21 years or 27 years of running a gas station, you never had one

17  day when one employee covered for another employee?

18  A     Yes, but what I am saying is, it changed days.

19  Q     They changed days.  But you never had an employee work

20  additional hours more than forty hours per week?

21  A     No, sir.

22  Q     Do you know an employee by the name of Luis Lima?

23  A     Yes.

24  Q     Do you remember what his schedule was?

25  A     It was in the afternoon, five to ten, four days a week and

Marban - Direct - Dormoy                11

1    once in the weekend Sunday or Saturday, I think it was Sunday.

2    Q    He worked the night shift from five to ten, four days

3    during the week, does that sound about right?

4    A    Yes.

5    Q    At Dorcla?

6    A    Yes.

7    Q    Then on weekends on Friday and Saturday he would work from

8    10:00 a.m. until 10:00 p.m.?

9    A    I don't recall that.  Never did more than forty hours.

10   Q    So, if he worked five days a week from five to-- four days

11   a week from five to ten, what were the two other days that he

12   worked, what was his schedule for the two other days, do you

13   recall?

14   A    I don't recall exactly the detail.  But it was the whole

15   week was forty hours.

16   Q    Didn't you tell us that you had shifts, that each shift was

17   eight hours?

18   A    Each shift was eight hours, yes.

19   Q    Were there shifts ever longer than eight hours?

20   A    Sometimes, yes.

21   Q    And when you had shifts longer than eight hours, wasn't it

22   true that there were times when employees worked more than forty

23   hours a week?

24   A    No.

25   Q    Were there times when you paid your-- some of your

```
 1    employees in cash?

 2    A    One person, yes.

 3    Q    Did you pay other than Doris Berrocal, did you ever pay any

 4    other employee in cash?

 5    A    No.

 6    Q    You sure about that?

 7    A    I'm sure.

 8    Q    So every employee other than Doris Berrocal would be-- on

 9    the payroll, correct?

10    A    Correct.

11    Q    You never kept a document that explained a policy on

12    payment of overtime wages, isn't that correct?

13    A    What do you mean, the document?

14    Q    You never had any signs posted at the-- any of your stores

15    stating what-- that it was necessary to pay overtime wages to

16    employees that worked more than forty hours?

17              MR. EDE:  Objection, relevance.

18              THE COURT:  Overruled.

19    Q    Did you keep any--

20    A    No posters, no.

21    Q    You never had that?

22    A    No.

23    Q    So, did you have any documents that told employees that if

24    they worked more than forty hours a week, they would be paid

25    overtime?
```

Marban - Direct - Dormoy                              13

1    A    No.

2    Q    You never sought any legal advice to determine whether you

3    had to keep time records, did you?

4    A    Excuse me, I didn't understand.

5    Q    You told us before that you had destroyed your time

6    records, you had done-- you had thrown them away.  So my

7    question is, isn't it true that you never sought any legal

8    advice to determine whether you had to keep employees' time

9    records or not?

10   A    Well, the time sheet that is signed every week that is what

11   my accountant gave me.  That is what he told me to make each

12   employee sign it.

13   Q    Right.

14   A    He says, in the bottom, if they have to complain, they

15   should complain right away.

16   Q    Did your accountant tell you, that you had to keep those

17   time records for three years?

18   A    Three years-- no, he told me seven years.

19   Q    For seven years.

20        But you destroyed them anyway?

21   A    No, I destroyed the shift report.  Where the cashier writes

22   the hours.

23   Q    Yes.

24   A    Because that went into the schedule.

25   Q    Correct.

1    A    And I kept the schedule.

2    Q    But those schedules you do not have here today, do you?

3    A    No.  I have the time sheet.  Every week they sign it.

4    Q    But you don't have it here at this trial, during this

5    trial, you don't have that as an exhibit that you intend to use,

6    isn't that correct?

7    A    Yes.

8    Q    You do have it?

9    A    No, I don't, you have it.  You asked me for it.

10   Q    Okay.

11        I have-- have you given me those records for Doris

12   Berrocal?

13   A    No.  For her, I said I don't have it.

14   Q    But, you say that she was an independent contractor when

15   she worked at Moody, correct?

16   A    Correct.

17   Q    But when she worked at Dorcla, she was-- you don't claim

18   she was an independent contractor, do you?

19   A    No, I don't.

20   Q    So, since she was an employee, you do agree with me that

21   you should have records for her when she worked at Dorcla?

22   A    That's what I told you, that was destroyed in my garage

23   with the water.

24   Q    Now, you are the person, were you not, that calculated the

25   hours that employees would work, isn't that correct?

1    A    Correct.

2    Q    And the way you calculated those hours was by looking at

3    the shift report and the hours that were written down by the

4    employees?

5    A    Correct.

6    Q    And then, if that is the way you calculated the hours that

7    employees work, why would you need an additional document, a

8    schedule to calculate the hours that they worked?

9    A    Because when I-- at the end of the week, I add up all the

10   hours, I see how many, 40, 30, 35, 26.  I put it into the time

11   sheet that they signed.

12   Q    But in any event, at the end of the week you are the person

13   that paid all of your employees?

14   A    Yes.

15   Q    You are the one that paid the employees at Moody Petroleum,

16   correct?

17   A    Correct.

18   Q    You are the one that paid the employees at Dorcla, Inc.?

19   A    Correct.

20   Q    I want to discuss now, Mrs. Berrocal's employment.  Do you

21   recall the first time that she worked at the Eureka gas station?

22   A    It was I believe in 2001, exactly I don't know.

23   Q    Do you recall whether in the year 2001, she was also

24   working at another gas station?

25   A    Yes, she told me.

```
1   Q   An Exon gas station?

2   A   An Exon gas station, yes.

3   Q   Which is not related to you?

4   A   No.

5   Q   And do you know whether she worked at the Exon gas station

6   during the day?

7   A   I understood she was working there in the morning.

8   Q   At the Eureka in 2001, do you recall what her shift was?

9   A   She was in the afternoon always.

10  Q   From five to ten?

11  A   It was four to ten.

12  Q   Four to ten.

13  A   Yes.

14  Q   How many hours-- how many days a week?

15  A   Six.

16  Q   So she was working about 36 hours a week?

17  A   Correct.

18  Q   When did she cease working at the Dorcla gas station, when

19  did she stop working there?

20  A   When she start?

21  Q   Stop.

22  A   Stop, May 31, 2006, when it closed down.

23  Q   Did you-- were you the person who would hire employees at

24  Dorcla, Inc.?

25  A   No.
```

```
1   Q    Who was that?

2   A    Her husband.

3   Q    Mrs. Berrocal's husband is the person that hired employees?

4   A    Yes.

5   Q    At Dorcla, Inc..

6             But, you had a say in which employees had to be hired,

7   correct?

8   A    Well, he would choose a person, I would have a talk with

9   the person and that was it.

10  Q    So you had an input.  I mean they would not hire somebody

11  to work at Dorcla, Inc. unless you approved it, correct?

12  A    Correct.

13  Q    And for Moody Petroleum, you were also the person who had

14  the authority to hire employees at Moody, isn't that correct?

15  A    I was the authority, yes.

16  Q    Now, you are telling me that you are not the person who

17  hired her to work at Dorcla, it was her husband?

18  A    No, that is not what I said.  I said that when she started,

19  I did hire her.

20  Q    Okay.

21  A    Her husband became the manager after that.

22  Q    Okay.

23  A    He was the one that was looking for employees.

24  Q    And who is the person that determined how much she was

25  going to be paid at Dorcla, Inc. when she first went to work
```

Marban - Direct - Dormoy                                18

1    there?

2    A     Well, we have helpers, cashiers, and how long they have

3    been in the company.  So it was a -- like a scale from five to

4    ten an hour.

5    Q     And the person who determined how much employees would be

6    paid, that would be you, correct, at Dorcla?

7    A     Yes.

8    Q     And, you would also be the person who would determine how

9    much employees would be paid at Moody, correct?

10   A     Correct.

11   Q     Now, when she worked at Dorcla, Inc., at Eureka she worked

12   as a cashier didn't she?

13   A     Yes.

14   Q     And I believe you told me that you already paid her in

15   cash?

16   A     Yes.

17   Q     And do you recall how much she was paid per hour?

18   A     During her time, it went from 5.50 to at the end $7.50.

19   Q     Do you recall when it was when she began to make $7.50?

20   A     It must have been the last year.  The last year she worked

21   there.

22   Q     Did she ask you for a raise?

23   A     Yes.

24   Q     And did you give her a raise?

25   A     Yes.

1  Q     And, what did you raise her wages from, from what to what?

2  A     I think she started with six and ended up with $7.50, over

3  so many, four years.

4  Q     You don't recall exactly when it was that she got the

5  raise?

6  A     No.

7  Q     When you gave her the raise, for the work at Eureka, Dorcla

8  gas station, did you also give her a raise for the Moody gas

9  station at the same time?

10 A     No, because when she started at Moody, it was already

11 $7.50.

12 Q     So, in--

13 A     It wasn't 7.50, her salary there was based on $7.50.

14 Q     So when she began working at Moody, she was always earning

15 7.50 an hour?

16 A     She was earning $60 a day.  Days on -- eight hours times

17 7.50.  It is not .50 hours.  She never got counted.

18 Q     Anyways, it would be based on the same rate she was being

19 paid at the Eureka gas station, 7.50 an hour?

20 A     Correct.

21 Q     You are the person who determined how much she would be

22 paid at Moody, correct?

23 A     Yes.

24 Q     Do you know when it was that she began working at Moody?

25 A     2003, exactly when, I don't recall.

```
1    Q     Isn't it true that when she started working at Moody she
2    was also working at Eureka?
3    A     Yes, she was.
4    Q     And the reason she went to Moody is because you had a lady
5    that was running the cafeteria portion of the gas station, who
6    wanted to have days off?
7    A     No.
8    Q     Why did she go to work at Moody then?
9    A     Because it was like a franchise I had there.  It was a
10   different company that was running the cafeteria.
11   Q     Okay.
12   A     They went bad and I had to take over.
13   Q     But that wasn't my question.
14         My question is, isn't it true that Ms. Berrocal went
15   to work at Moody Petroleum because the lady who was cooking food
16   at Moody was leaving?
17   A     Yes, the company that was running the food store left, yes.
18   The cook was them, I think so.  That was not my cook.
19   Q     The lady that was working there was not your employee?
20   A     No, sir.
21   Q     In your convenience store?
22   A     No, sir.
23   Q     Do you remember the name of the lady who was working there?
24   A     I don't, we had so many.
25   Q     Well, the cafeteria that was inside the gas station, that
```

```
 1   belonged to Moody, didn't it?

 2   A    The building, yes.

 3   Q    Well, the cafeteria was right inside the Moody gas station?

 4   A    Yes, inside, yes.

 5   Q    And the cafeteria belonged to Moody didn't it?

 6   A    Yes.

 7   Q    In fact, if the cafeteria made a profit it was Moody who

 8   made a profit?

 9   A    Of course, yes.

10   Q    And if the money had to be spent to buy supplies it was

11   Moody who bought the supplies, wasn't it?

12   A    When -- after she started working, yes.

13   Q    After who started working, Mrs. Berrocal?

14   A    Mrs. Berrocal.

15   Q    So when Mrs. Berrocal started working at Moody it was your

16   gas station, it was the Moody-- I'm sorry, your cafeteria?

17   A    Yes.

18   Q    It wasn't Mrs. Berrocal's cafeteria?

19   A    No.

20   Q    She was your employee at Moody wasn't she?

21   A    She was for me, she was hired to perform something.  And do

22   as good as she could, for the cafeteria to do well.

23   Q    She was hired to cook the food at the cafeteria?

24   A    Cook, serve, buy, buy the supplies, decide what to do, the

25   menu and everything she was doing.
```

1    Q    She also at times when she worked at Moody in the morning

2    she also worked the register, the cash register, didn't she?

3    A    Yes.

4    Q    And she also, a vendor came in, she is the one that tended

5    to the vendors?

6    A    For the supply, for the fast food, yes.

7    Q    Because at Moody, you only had two employees working in the

8    morning, you had a cashier and you had Mrs. Berrocal working in

9    the morning?

10   A    Correct.

11   Q    And, you are the one that determined at the end of the week

12   how much she would be paid?

13   A    She knew the first day she got there how much she is going

14   to be paid.

15   Q    You told me before for all the time she worked at Moody she

16   didn't miss any time from work?

17   A    I said I didn't recall any.

18   Q    You don't recall her missing a day from work?

19   A    No.

20   Q    So you don't recall ever deducting $60 a day?

21   A    I don't recall any.

22   Q    And how many days a week did she work at Moody?

23   A    Who?

24   Q    Mrs. Berrocal?

25   A    Six days.

1  Q    Her schedule was from eight in the morning until four in

2  the afternoon, correct?

3  A    She decided what time she came in and came out.

4  Q    So, are you telling this jury that you had a cafeteria that

5  she had to run, but she could decide whenever she wanted to come

6  in?

7  A    Yeah, because she was hired to serve lunch from eleven to

8  four.  She could come at 8, 8:30.  Of course she cannot come at

9  10:30 she wouldn't be able to prepare the food.

10 Q    Right.

11 A    So she was coming usually between 8, 8:30, 9 o'clock every

12 day.

13 Q    But, her schedule, the expected time for her to come in

14 would be 8 o'clock in the morning; isn't that correct?

15 A    That wasn't the base for her salary, that's all.  That is

16 for basis.  I didn't know how to-- how much I am going to pay

17 somebody like that.  So I based it on eight hours times $7.50

18 that is how I did it.

19 Q    Okay.

20       But you expected her to be there and have the cook

21 prepared by ten, 10:30, didn't you?

22 A    Well, yes.

23 Q    And the only other person at the store was the cashier

24 and-- other than Mrs. Berrocal, the other person at Moody is at

25 the Moody gas station was the cashier?

1    A    And myself.

2    Q    You would be there almost every day?

3    A    Almost every day.

4    Q    You would not be there all the time?

5    A    No.

6    Q    Because you had other gas stations?

7    A    Yes.

8    Q    I talked about Dorcla, I talked about Super Stop.  Did you

9    also own any other gas stations during that period of time in

10   2003, through 2007?

11   A    No.

12   Q    I thought your attorney said you owned four gas stations?

13   A    Yes, altogether, yes.

14   Q    What is the other gas station that you owned?

15   A    Well, I owned the second one was with my brother, the one

16   is closed already.  And he bought it in 2000.  He bought my

17   property in 2000.

18   Q    How many years did you have that other gas station?

19   A    Three years.

20   Q    What was the name of it?

21   A    Princeton Amoco.

22   Q    Where was it located?

23   A    U.S. 1 and 248th Street South West.

24   Q    Do you agree that when Ms. Berrocal was at Moody Petroleum

25   she worked more than 48 hours a week?

1   A    She must have, yes.

2   Q    Or 48 hours a week.

3   A    But she also between eight and nine in the morning, I can't

4   tell you exactly more than forty, yes.

5   Q    You never paid her overtime for working there for running

6   your cafeteria?

7   A    No, that was not the case.

8   Q    You never even considered paying her overtime for her work

9   at Moody, isn't that correct?

10  A    I didn't see why.

11  Q    But you never even discussed the issue of overtime with

12  her, you never considered that, isn't that correct?

13  A    I never considered it and she never considered it either.

14  Q    And her purpose at Moody was to make a profit for you, for

15  the gas station?

16  A    Well, it is not really just related to me, because her job

17  was in the middle.  Of course if the profit goes to, she still

18  has a job and she could feed her family.

19  Q    But her job there was to make a profit for you, isn't that

20  correct?

21  A    It was not to lose money.  I always told her, you can't

22  lose money in the cafeteria, if you lose money, I'm going to

23  close it down.

24  Q    But, the objective was she make a profit?

25  A    She was supposed to, yes.

1   Q    She never invested any of her own money in the cafeteria,

2   did she?

3   A    I don't think so.

4   Q    It was your company, Moody, that invested the money into

5   the cafeteria?

6   A    Moody was like the working capital, buying the food for

7   her, for her to prepare, to sell it.

8   Q    She never received a percentage of the sales?

9   A    No, but she received bonuses at the end of the year.

10  Q    The bonus of 150, $100 at the end of the year?

11  A    More.

12  Q    How much more?

13  A    It was $300.

14  Q    At the end of the year?

15  A    Yes.

16  Q    For working 48 hours a week, 52 weeks in a year, she

17  received $300?

18  A    That is what she was getting.  A lot of people don't even

19  get that.

20  Q    So, in conclusion, you never took any steps to try to

21  determine whether you had to pay her overtime wages for her work

22  at Moody; isn't that correct?

23          MR. EDE:  Objection, asked and answered.

24          THE COURT:  Overruled.

25  A    The way her salary was based, I never considered overtime

1    for her.

2    Q    So you never took any actual steps by going to see a

3    lawyer, to determine whether you had to pay her overtime?

4    A    No.

5    Q    And, part of her duties at Moody if she was-- she was

6    having a meal break, let's say she stopped for a second to eat

7    something, a customer had to come into the store, the duty was

8    to interrupt the meal and attend to the customer, isn't that

9    correct?

10   A    I expected her to have lunch before the start the whole,

11   all the customers come in.

12   Q    But, if she was in fact having lunch at any time, and a

13   customer came in, she had to interrupt her lunch, attend the

14   customer; isn't that correct?

15   A    I never told her that.  But I-- any conscious person will

16   do it.

17   Q    Do you remember giving your deposition under oath at my

18   office, on January 29th, 2008, and you remember this question

19   and this answer, page 33, line 19, line 16.

20        But, she had lunch.  She had to continue to attend--

21   she had to continue to attend to the cafeteria?

22              ANSWER:  "Yes."

23              QUESTION:  "If she was having lunch and a

24   customer came in, she would have to stop her lunch and attend to

25   the customer, correct?"

```
 1                   ANSWER:  "Yes."

 2   A     That is what I said.

 3   Q     So she would have to stop what she was doing and attend--

 4   her meal and attend to the customer, correct?

 5   A     Correct.

 6   Q     I want to show you what we previously marked as Plaintiff's

 7   Exhibit 3, your answer to interrogatories.

 8              I guess the Clerk has the extra copies of the

 9   Exhibit 3.

10              Mr. Dormoy, do you recognize your signature in the

11   back of Exhibit 3?  On page five?

12   A     Yes.

13   Q     Do you remember filling out this interrogatory with your

14   attorney?

15   A     Yes.

16   Q     You were pretty much the person in charge of ensuring that

17   employees got paid, paying the employees and calculating what

18   they were paid, isn't that correct?

19   A     Correct.

20              MR. MARBAN:  Your Honor, I would like to move

21   Exhibit 3 into evidence which are the answers to the

22   interrogatories.

23              THE COURT:  Okay.

24              MR. EDE:  I thought it had been withdrawn.  He is

25   going to put it back in.  I am not going to object to the answer
```

```
 1   to the interrogatories.

 2              THE COURT:  All right.  Exhibit 3 is admitted.

 3              (So marked.)

 4   Q    It was my clients's answers.

 5              I want to ask you, did Mrs. Berrocal when she was

 6   working at Moody from 2003 through 2007, you already told us

 7   that she also worked at Dorcla, Inc. in the afternoon from

 8   5 o'clock-- I'm sorry, from 4 o'clock until 10 o'clock at night

 9   do you remember telling me that?

10   A    Yes.

11   Q    Do you concede she was working at both places at both gas

12   stations at the same time?

13   A    Yes.

14   Q    So -- but if your schedule was at four, at Moody Petroleum,

15   you told us that her schedule commenced at 4 o'clock at Dorcla.

16   How can that be?

17   A    Well, she was paid for that hour.

18   Q    She had to travel from Moody to Dorcla, Inc., correct?

19   A    Correct.

20   Q    And, your testimony is that she was actually paid for one

21   hour of travel time?

22   A    Yes.

23   Q    You have no proof that you paid her for that hour of travel

24   time?

25   A    She was getting 36 hours at Dorcla.
```

1    Q    I'm sorry?

2    A    She was paid 36 hours at Dorcla.  For six days.  Six hours

3    a day.

4    Q    But, you told me that she was working from 4 o'clock until

5    10 o'clock.  So, are you saying that the 4 o'clock hour, you are

6    including the travel time?

7    A    Yes, between twenty or thirty minutes of travel time.

8    Q    Did she sometimes when she traveled from Moody to Dorcla,

9    did you ask her to bring lottery tickets to Dorcla?

10   A    I don't recall any.

11   Q    Did you ever ask her to in her travels to bring any

12   merchandise from Moody to Dorcla?

13   A    I don't recall any.

14   Q    Do you know whether your wife ever asked her to bring any

15   supplies from Moody to Dorcla?

16   A    That I don't know.

17   Q    So in total, according to your testimony, she worked

18   48 hours at Dorcla and she worked 36-- I'm sorry, four hours at

19   Moody and 36 hours at Dorcla the same week?

20   A    If she was there every day, at 8 o'clock at Moody, yes,

21   that would be the calculations.

22   Q    And, you never paid her any overtime wages for working at

23   both companies?

24   A    No.

25   Q    Did you ever consult an attorney, to determine whether you

1   had to pay her overtime wages when she worked at Dorcla, Inc. in

2   the afternoon?

3   A    I had an experience.  First, I had my first accountant told

4   me, employees can work for two different corporations.  I mean,

5   corporation has different tax number, different.  They can do it

6   without having to put it together.

7   Q    Your accountant is not an expert on the Fair Labor

8   Standards?

9   A    I have a case.

10  Q    Excuse me?

11  A    I had a case, a claim.

12  Q    They claim overtime against you once before?

13  A    Yes.

14  Q    Okay.

15        So, what year was that?

16  A    I don't recall, but it was before I sold the Super Store

17  that must have been in 2001, 2000, 2001.

18  Q    Did you consider the employment at Moody to be separate

19  from the employment at Dorcla?

20  A    Yes, different corporation.

21  Q    Even though that you were the person who paid employees at

22  Moody and the person who paid employees at Dorcla?

23  A    Yes.

24  Q    And, that relationship was pretty permanent.  She worked

25  exclusively for Moody and Dorcla at least from 2003, through at

1    least May 31st of 2006, correct?

2    A    Yes.

3    Q    And, your only-- the only thing you did was to consult with

4    an accountant?

5    A    I had the accountant told me at the beginning when I got

6    into the gas station business, I could do it.  When I got a

7    second gas station.

8    Q    The answer to my question is, you never consulted with an

9    attorney about that?

10   A    No.

11   Q    Did you have any other employees who worked at both gas

12   stations at the same time?

13   A    Not those two gas stations, but I had one that worked in

14   the other two.

15   Q    Worked at two other gas stations?

16   A    It was Moody and Super Store.

17   Q    And, in that time that you were sued, didn't you learn that

18   you-- if employees worked for two of your gas stations, there

19   was a joint employment and you would have to pay overtime wages

20   to both?

21   A    I'm sorry, that wasn't a suit.

22   Q    Wasn't a suit?

23   A    No, she made a claim with a livery department and Labor

24   Department and the claim was denied.

25   Q    With the Labor Department?

```
 1   A    I learned the claim was denied.

 2   Q    Because she was claiming she was working at both gas

 3   stations?

 4   A    She was claiming she was right, working at both gas

 5   stations, yes.

 6   Q    And which gas stations were those?

 7   A    Moody and Super Store Amoco.

 8   Q    Do you remember what year that was?

 9   A    I'm saying, 2000-- that was before I lost-- I closed that

10   station.  I sold it.  That was 2000, around 2000.

11   Q    Around the year 2000?

12   A    Yes, around the year 2000.

13   Q    When did she make her claim?

14   A    When?

15   Q    When did she make her claim?

16   A    I don't recall exactly.

17   Q    What year?

18   A    It was at least 2000 or 2001.

19   Q    Do you have any paperwork?

20   A    I tried to find it believe me, I could not find it.

21   Q    Did the Department of Labor give you a letter?

22   A    I think it was the Department of Labor, I don't know who

23   did it.  Yes, yes.  I received a letter.

24   Q    You think it was a Department of Labor?

25   A    I received a letter denying the claim from her, but I don't
```

1    remember from whom.

2    Q    Mr. Dormoy, I want to show you a request for production

3    that was served on Moody Petroleum, it is labeled Exhibit 5.  Do

4    you recall receiving a copy of this document?

5    A    Yes.

6    Q    Do you recall filling out this document with your attorney?

7    A    Yes.

8    Q    Let's look at paragraph 13, it states, any and all

9    documents admitted by the Defendants to the United States

10   Department of Labor of Florida, (Fair Labor Standards Division),

11   regarding either agency's investigation and/or audit of the

12   defendant's wage hour practices during the relevant time period.

13        Do you recall that request?

14   A    Yes.

15   Q    You put "none".

16   A    Right.

17   Q    And then in 14 is, any and all documents received from the

18   Florida Department of Labor Fair Labor Standards Division

19   regarding the agency's investigation and/or audit of the

20   defendant's wage hour practices during the relevant time period.

21        Do you recall that request?

22   A    Yes.

23   Q    None.

24        You had no-- you stated that you had no such

25   documents?

1    A    Well, first, I was through Super Store Inc., and I told

2    you, I could not find.  I can't find it.  I have been looking

3    for that paper, I can't find it.

4              MR. MARBAN:  Your Honor, I would like to move into

5    evidence, Plaintiff's Exhibit 5.

6              MR. EDE:  Again we thought this was withdrawn.  It is

7    not a signed statement by my party.  We object on the basis of

8    hearsay.

9              THE COURT:  Okay, that objection is overruled.  It

10   will be admitted over objection.

11             (So marked.)

12   Q    Were there any Department of Labor investigations related

13   to Dorcla, Inc.?

14   A    No.

15   Q    But in any event, when you were supposedly investigated by

16   the Department of Labor, in relation to Moody, that was in the

17   year 2000?

18   A    I believe so, yes.

19   Q    Didn't you then become aware that you needed to keep time

20   records?

21   A    I have time records.

22   Q    But you destroyed them?

23   A    I have the paper that is signed every week.

24   Q    Okay.  In the year 2000, 2001, you were audited by the

25   Department of Labor and you had to have known at that time that

1  you had to keep time records didn't you?

2  A    I wasn't audited by them.

3  Q    You said there was a claim made with the Department of

4  Labor.

5  A    There was, I received a paper with some questions, and

6  answered.  The claim was declined.

7  Q    And, you never learned as a result of that investigation

8  that you had to keep time records as to the hours that your

9  employees worked?

10  A    Well, I have time records.  That is what I am saying on the

11  paper that they sign every week.

12  Q    I'm sorry?

13  A    I'm sorry, if it is not what you want, that is what I have.

14  Q    I apologize, I don't want to keep repeating the same

15  question again.  I don't want to waste anybody's time doing

16  this.

17          THE COURT:  Can we clarify Mr. Marban with respect to

18  which corporation you are referring to.

19          MR. MARBAN:  Yes.

20          THE COURT:  We have been over this a few times.

21          MR. MARBAN:  Yes, that is why I apologize.  I have

22  over done it.

23  BY MR. MARBAN:

24  Q    The investigation was in regards to Moody Petroleum and

25  Super Store?

1    A    Right.

2    Q    That is what you told me.

3              MR. MARBAN:  Thank you, that is all I have.

4              THE COURT:  Do you have cross examination Mr. Ede?

5              MR. EDE:  Yes, I do, Your Honor.

6              THE COURT:  Okay.

7    CROSS EXAMINATION BY MR. EDE:

8    Q    Mr. Dormoy, what is the relevant time period in your mind

9    as it relates to Doris Berrocal?

10   A    I didn't get that one.

11   Q    The relevant time period.  Mr. Marban asked you about

12   documents dealing with the Department of Labor, the United

13   States Department of Labor or Florida Department of Labor.  And

14   the phrase, during the relevant time period, and your response

15   was none.  I don't have any records.

16             What is the relevant time period in your mind, as it

17   relates to Doris Berrocal.  What is relevant regarding Doris

18   Berrocal?  When did she first go to work for you?

19   A    It was 2001.

20   Q    Mr. Marban went right into the heart of it.  I would like

21   to ask you some questions about yourself personally and your

22   background in the gasoline business.

23             Mr. Dormoy tell the jury how old you are today?

24   A    I am 60.

25   Q    Are you married?

```
 1    A     Yes.

 2    Q     To whom?

 3    A     Maria Elisa Dormoy.

 4    Q     For how long?

 5    A     30 years.

 6    Q     Do you have any children with Elisa?

 7    A     Two.

 8    Q     And what are their genders, boy, girl, what is it?

 9    A     First a girl and then a boy.

10    Q     Do they live with you?

11    A     Right now, no.

12    Q     What does the girl do?

13    A     She lives with her husband.

14    Q     Does she work?

15    A     She works, yes.

16    Q     Does she go to school?

17    A     She does.

18    Q     What is she studying?

19    A     She is taking a master's in nursing.

20    Q     What about your son, does he work or go to school?

21    A     He go to school.

22    Q     Where does he go to school?

23    A     Valencia College in Orlando.

24    Q     You have a little bit of a French accent.  Where were you

25    born?
```

1   A    I was born in the French West Indies in the Caribbean.

2   Q    When did you first come to the United States for the first

3   time?

4   A    It was in 1968.

5   Q    Why did you come to the United States in 1968?

6   A    Because I was-- I had to stop college and finish high

7   school.  At that time there was a big revolution in the French

8   University.  So I would have lost about one or two years,

9   because there was no opening.  And my brother was already here,

10  so my father told me, go over there.  You are going to study.

11  Q    "Here" meaning where?

12  A    In Miami.

13  Q    What did you study in Miami?

14  A    Where?

15  Q    What?

16  A    Civil engineering.

17  Q    Did you ever serve in the armed forces?

18  A    Yes.

19  Q    What area and for what country?

20  A    I served for the French Army.

21  Q    When you left the army, did you go to work?

22  A    Yes, right away.

23  Q    Where and for what company?

24  A    I went to work in Brazil for a company called

25  Allebrek(phonetic).

```
 1              MR. MARBAN:  Objection, Your Honor, beyond the scope
 2     and relevancy.
 3              THE COURT:  Overruled.  I assume he is not going to
 4     repeat this in the defense case.
 5              Go ahead, answer the question.
 6     A    A construction company called Allebrek.
 7     Q    Where was that?
 8     A    In 1976.
 9     Q    Where?
10     A    In Rio de Janeiro.
11     Q    Where is that?
12     A    Brazil.
13     Q    What is Allebrek do?
14     A    They built heavy construction like airport, nuclear plants,
15     hydro electric dams.
16     Q    What did you do when you worked for Allebrek?
17     A    I was manager in the jobs, different jobs that they had.
18     Q    What types of functions did you do?
19     A    I was like a technical expertise.  I always looking for new
20     methods of construction and try to apply them and at the same
21     time I had a lot of employees with me, working for me.
22     Q    Did you do any engineering?
23     A    Yes, I did, yes.
24     Q    Did you do any cost analysis?
25     A    Yes, I did.
```

```
1    Q    Did you do any estimating?

2    A    Yes, I did.

3    Q    Did you do any scheduling?

4    A    Yes, I did.

5    Q    How long did you work for Allebrek in Brazil?

6    A    In Brazil fifteen years.

7    Q    When did you leave?

8    A    In 1990.

9    Q    Why did you leave?

10   A    Because they wanted to open their company here in Miami, so

11   they send me to open the company here.

12   Q    Allebrek hadn't been in Miami before?

13   A    No.

14   Q    They sent you here to open them up in Miami?

15   A    Correct.

16   Q    Did you do that?

17   A    Yes, I did.

18   Q    Did Allebrek have any projects in Miami?

19   A    Yes, yes, a lot.

20   Q    Are there any that you can recall?

21   A    Well, we did the metro mover, the south loop.  We did the

22   HOV, Golden Glades overpass, performing arts center, Miami

23   arena, the airport.  The north terminal at the airport.

24   Q    You are not employed by Allebrek, correct?

25   A    No.
```

1   Q    Why did you leave?

2   A    Because after three years here, everything was starting to

3   work perfect and they needed me in another country.

4   Q    Do you recall what other countries?

5   A    It was Angola, South Africa, Costa Rica.

6   Q    Did you have a family at the time?

7   A    Yes, I did.

8   Q    Now, so you retired or you ceased working for Allebrek,

9   right?

10  A    Correct, I ceased working for them.

11  Q    What did you do after you left Allebrek?

12  A    After I left Allebrek, I was looking for a way to sustain

13  my family.  So, I figured out, studied about gas stations, and

14  that was a good business.  Once you buy it, you start having

15  revenue.  Compared to having the new construction company that

16  would take five or ten years to make any profit.

17  Q    Did you get into the gas station business at that time?

18  A    I did.

19  Q    You bought a gas station?

20  A    I bought Eureka Drive.

21  Q    That is the Dorcla gas station?

22  A    Dorcla gas station, yes.

23  Q    You call that gas station the South Dade?

24  A    South Dade Amoco.

25  Q    That gas station is not in business any more, is it?

```
1    A    Well, they reopened for awhile right now.

2    Q    Excuse me?

3    A    They closed about three years, now they are open.  They are

4    going to close at the end of the year.

5    Q    I am talking about Dorcla when you owned it?

6    A    Yes.

7    Q    It closed, I think you said May 31st?

8    A    May 31st, yes.

9    Q    That was 2006?

10   A    May 31, 2006, yes.

11   Q    There was some questions during jury selection that

12   relationships between oil companies, petroleum companies and gas

13   station, I want to ask you a few questions about that.

14            The Dorcla gas station was an Amoco gas station,

15   right?

16   A    Yes.

17   Q    A BP Amoco?

18   A    Yes.  It was first Amoco than became BP.

19   Q    What type of gasoline was sold at that gas station?

20   A    BP.  The first Amoco and then BP.

21   Q    Did Amoco or BP operate, in other words, run that gas

22   station?

23   A    No.

24   Q    Who did?

25   A    I did.
```

```
 1   Q    And did you do that through a corporation?

 2   A    Through a corporation, yes.

 3   Q    What was the name of that corporation?

 4   A    Dorcla, Inc.

 5   Q    Being with a petroleum company, BP Amoco, were there

 6   certain rules and regulations you had to follow?

 7   A    Yes.

 8   Q    Tell the jury some of them.

 9           MR. MARBAN:  Objection, relevancy.

10           THE COURT:  I will let you go into it insofar as it

11   concerns employees and so forth, but not just--

12           MR. EDE:  That is where I am going, thank you.

13           THE COURT:  Okay.

14   BY MR. EDE:

15   Q    Were you required to buy gas from BP or Amoco?

16   A    Yes.

17   Q    Were you required to display their signs and decals?

18   A    Yes.

19   Q    Did you have any requirements with regard to what the

20   employees were supposed to wear?

21   A    Yes, supposed to wear a uniform with a name tag.

22   Q    And tell the jury a little bit about a uniform, did it say

23   something on it?

24   A    Yes, a uniform first, when it was Amoco, we had the Amoco

25   on it.  And then it turned to BP, halo, the rounded flower.  And
```

```
 1   it was supposed to have the name tag on top of it.  The color

 2   was either red or blue.

 3   Q    Doris Berrocal was an employee at South Dade Amoco Dorcla,

 4   right?

 5   A    Yes.

 6   Q    Was she required to wear a uniform?

 7   A    Yes.

 8   Q    Did she wear a uniform?

 9   A    Yes.

10   Q    Was there a time you became involved in another gas

11   station?

12   A    Yes.

13   Q    When was that?

14   A    The second one was Princeton Amoco.

15   Q    What year did you get involved in Princeton Amoco?

16   A    Beginning of '97.

17   Q    What was the corporation that owned Princeton Amoco?

18   A    It was Cador, Inc. C-A-D-O-R.

19   Q    Inc.?

20   A    Yes.

21   Q    Like incorporated?

22   A    Yes.

23   Q    Amoco didn't own Princeton Amoco, they didn't operate it,

24   correct?

25   A    Correct.
```

1  Q    Now, without going through all the questions again, the

2  Cador, Inc. Princeton Amoco, questions -- your answers to the

3  questions would be the same in relation to that gas station as

4  the Dorcla gas station with regard to following Amoco's rules

5  and regulations, correct?

6  A    Correct.

7  Q    How long were you involved in that Princeton Amoco?

8  A    About three years.

9  Q    In 2000, you sold your interest to your brother?

10  A    Correct.

11  Q    You also mentioned in response to Mr. Marban, you were

12  involved in something called, you had a company called, Super

13  Stop?

14  A    Correct.

15  Q    He asked you about Super Stop Exon, correct?

16  A    Correct.

17  Q    But that wasn't the first gas station that that corporation

18  operated, was it?

19  A    Correct.

20  Q    What was the first gas station that Super Stop Inc.

21  operated?

22  A    That was a Super Stop Amoco.

23  Q    What year was that?

24  A    Started in end of 1997.

25  Q    So when Mr. Marban was asking you questions about '97 and

1    Super Stop, that was a different gas station, that wasn't the

2    Exon, that was the Amoco, right?

3    A    Correct.

4    Q    You kept that corporation, Super Stop, Inc., and then later

5    bought another gas station, right?

6    A    Correct.

7    Q    And again, that-- the following procedures, wearing

8    uniforms, everything else was the same for Super Stop as it was

9    for South Dade as it was for Princeton; is that correct?

10   A    Correct.

11   Q    When did you cease any involvement in Super Stop Amoco?

12   A    Super Stop Amoco was sold in, I recall correctly July 2002.

13   Q    You also talked a little bit about Moody, right, was Moody

14   the next gas station that you got involved in?

15   A    Correct, that was 2000, yes.

16   Q    Moody Amoco is owned by what company?

17   A    Moody Amoco is owned by Moody Petroleum Inc.

18   Q    And Moody Petroleum Inc. is owned by who?

19   A    By me and my brother.

20   Q    You own fifty percent and your brother owns fifty percent,

21   right?

22   A    Correct.

23   Q    But that is a different brother than the brother that you

24   were involved in Princeton Amoco, right?

25   A    Correct, that is a different brother.

```
1    Q    How many brothers do you have?

2    A    Four and a sister.

3    Q    And again, without wasting time, the same answers to the

4    same questions, with about buying gas from Amoco, displaying

5    their decals, wearing uniforms, it would all be the same there

6    at Moody, right?

7    A    Correct.

8    Q    Now, did Doris Berrocal wear a uniform at Moody Amoco?

9    A    I don't recall her using it, no.

10   Q    Mr. Marban asked you about Super Stop Exon, was that the

11   next gas station that you were involved in?

12   A    Yes, the other one.

13   Q    You got involved in that in 2002?

14   A    Correct.

15   Q    Same situation, Exon didn't own that, right?

16   A    No.

17   Q    The Florida corporation owned it?

18   A    The Florida corporation, Super Stop Inc.

19   Q    And the same answers to the same questions, following

20   regulations, buying your gas, wearing uniforms, displaying

21   decals, would all be the same as your prior testimony, right?

22   A    Correct.

23   Q    You still have an interest in Super Stop Exon, right?

24   A    Yes.

25   Q    So right now, if I got it right, you own two gas stations,
```

1    one is the Moody Amoco and one is the Super Stop Exon?

2    A    Correct.

3    Q    You have a fifty percent interest in each one of them,

4    right?

5    A    Correct.

6    Q    Each one is a separate corporation, right?

7    A    Correct.

8    Q    Now, in the past, I think fifteen years, several gas

9    stations, you have hired employees, haven't you?

10   A    Yes.

11   Q    You have also hired independent contractors over those

12   fifteen years with those four or five gas stations, haven't you?

13   A    Yes.

14   Q    Tell the jury about how you set up the shifts again, how

15   did you set up the shifts?

16   A    The shifts were from 7:00 a.m. to 3:00 p.m., 3:00 p.m. to

17   11:00 p.m., and 11:00 p.m. to 7:00 a.m..

18   Q    Was the requirement, not the requirement, the fact that you

19   kept the gas stations open 24 hours, was that because you wanted

20   to?

21   A    No.

22   Q    Why?

23   A    Well it was a contractual obligation with BP and now with

24   Exon too, you have to stay open 24 hours.

25   Q    Is it tough owning an operation that had to be run

1    24 hours?

2    A    What?

3    Q    Tough, was it difficult?

4    A    Oh, believe me, especially when the hurricanes come.

5    Q    Now, what would you do in circumstances when somebody

6    either got sick or missed a shift or fired or quit?

7    A    Well, most of the time, my wife, myself and my children, we

8    will substitute that person.  If that was--

9    Q    Okay.  Were there other times also that somebody who maybe

10   asking you for -- strike that.

11            Did you have employees asking you for more hours on a

12   regular basis?

13   A    Oh, yes, all the time.

14   Q    And when somebody would only be working twenty hours,

15   25 hours, would you sometimes find yourself being asked for an

16   extra shift?

17   A    Yes.

18   Q    And, when that opportunity became available, did you also

19   have occasion, the answer might not be, yes, but did you also

20   have occasion to let if there were extra hours to be covered,

21   covered by somebody who hadn't already worked forty hours?

22   A    Correct.

23   Q    Now, you also hired various independent contractors over

24   these fifteen years, haven't you?

25   A    I did.

```
 1              MR. MARBAN:  Objection, I have not been objecting, it
 2   is leading.
 3              MR. EDE:  It is cross examination.
 4              THE COURT:  You are on cross examination.  However, if
 5   you are going to continue to lead, I am going to restrict you
 6   to, I will sustain it beyond the scope objection.
 7              MR. EDE:  Okay.
 8              THE COURT:  So you can govern yourself accordingly.
 9              MR. EDE:  Thank you.
10   Q    When you hired independent contractors for whatever reason,
11   did you track the hours of the independent contractors?
12   A    No.
13   Q    Why not?
14   A    Because they were hired to do a certain task.  They had to
15   do it.
16   Q    You hired, you already testified, you hired Doris Berrocal
17   first as an employee at Dorcla and then eventually to run the
18   food concession at Moody, do you remember that testimony?
19   A    Yes, I do.
20   Q    How was it that you even heard about Doris Berrocal, where
21   did she come from, how did she come into your life?
22   A    Back in 2001, I believe, I had an employee, at Super Stop
23   Amoco, that he was volunteer at a church.  And he asked me, told
24   me, there is a person that is desperate for work, she has to
25   feed a family, she can't find any more work.  Where she works,
```

 1  they cut the hours.  I interview her with him and I said, okay,

 2  I can give you some hours.

 3  Q    She was ultimately hired by Dorcla, right?

 4  A    Correct.

 5  Q    Her work week was what hours, what days?

 6  A    Where?

 7  Q    Dorcla.

 8  A    Dorcla was six days a week, six hours per day.

 9  Q    Do you remember what she was paid at the end, the last

10  weekly pay rate?

11  A    The total or the--

12  Q    The total?

13  A    It was $270.

14  Q    How was that calculated?

15  A    It was 36 times $7.50.

16  Q    If at Dorcla she would have worked over forty hours, would

17  she have been entitled to overtime?

18  A    Yes.

19  Q    Did Doris Berrocal ever work on a Sunday at Dorcla?

20  A    I don't recall any, never.

21  Q    Now, you know and you heard that she is claiming overtime

22  by jumping the hours together to calculate the hours together,

23  and that is at your other gas station at Moody, right?

24  A    Right.

25  Q    Let's talk about Moody a little bit.

1          Tell the jury a little bit about the independent

2   contractor that ran the food concession before they left or you

3   let them go and gave it to Ms. Berrocal?

4   A    There were, I believe they were from Hialeah, it was called

5   Flavor House Cafe.  It started there in about the end of 2000.

6   It started bad and it became better, then it was bad and they

7   had problems.  And they quit.  By 2003, they quit, they left.

8   Q    When they left, what did you do?

9   A    Well, I wanted to get somebody else to run it.

10  Q    Did you look for other contract companies.  Just tell the

11  jury what you did.

12  A    Well, I was looking for somebody to take care of it.  So

13  everybody would come there, we would know about it.  I was

14  looking for somebody.

15  Q    Now, Doris Berrocal eventually became involved in that

16  operation, how did that happen?

17  A    Well, she heard about it.  She was working at the other

18  station.  And one day, she told me, hey, I lost my job at the

19  Exon and I need-- I can cook, I can do this, I can do that.  I

20  said, are you sure you can do all of that.  Yes, you know how to

21  cook, yes, yes, I gave her the job.

22  Q    Let's talk about what the requirements of that operation

23  were.

24          How did you hire her, did you hire her as an employee?

25  A    In Moody?

1    Q    At Moody to run the food concession?

2    A    She was hired as an independent contractor.

3    Q    And, why was she hired as an independent contractor, what

4    was different about that work, that operation, as opposed to the

5    work that she was already doing for you at Dorcla?

6    A    Because she was doing a different task completely based on

7    her, a cashier is a cashier.  You have hours to-- you have to be

8    there, you know, you have to really follow your hours and there,

9    it was more flexible.

10   Q    Not without talking about time responsibilities, what were

11   her job responsibilities, what was she responsible to do?

12   A    She was supposed to cook, buy the food, prepare the food,

13   serve the customer, get the supplies, choose the menu, talk to

14   the customers, she knows what they would like better than

15   others.  So she can make the restaurant go well.  All those

16   works she was supposed to do.

17   Q    What was the pay rate?

18   A    The pay rate was $60 a day.

19   Q    Was that agreed to?

20   A    Yes.

21   Q    Did it matter, the number of hours that she worked in order

22   to get $60 a day or 360 a week?

23   A    No, it doesn't matter.

24   Q    Did you have any time requirements for the food concession

25   for Ms. Berrocal at Moody Petroleum?

1    A    Yes, I had.

2    Q    What were those?

3    A    She had to serve-- I mean, lunch usually is served between

4    eleven and four.  So, she was supposed to have her lunch ready

5    between eleven and four.  From eleven to four.

6    Q    4 o'clock is a little bit late for lunch for me anyway.

7    Why did you require the hot food to be maintained until four?

8    A    Because we have a lot of schools around.  That is when the

9    kids come out of the school.  They eat french fries, a lot of

10   things.

11   Q    Who decided the menu?

12   A    She did.

13   Q    Who decided what supplies to order?

14   A    She did.

15            THE COURT:  I have a question just to clarify.

16            When the Hialeah company left, was there any time

17   between when they left and when Ms. Berrocal started, was there

18   any gap there?

19            THE WITNESS:  Yes, there was.

20            THE COURT:  And, what happened during that gap period?

21            THE WITNESS:  It was closed down, the cafeteria was

22   closed down.

23            THE COURT:  Okay.

24   BY MR. EDE:

25   Q    Now, with regard to the time requirements, did you keep

1    track of Doris Berrocal's hours at Moody running the food

2    concession?

3    A    No.

4    Q    Why not?

5    A    Because I felt, I did not have to, because she was an

6    independent contractor, she had a task to do.

7    Q    Now, if you for some reason became aware of or documented

8    the hours back when she was running the food concession at Moody

9    Petroleum, and the hours were more than 40, 41, 42, 43, would

10   you have paid her any more money than the daily rate?

11   A    No.

12   Q    Why not?

13   A    Because she was an independent contractor.  She was hired

14   for that task.

15   Q    You heard in the opening statement, you are aware she is

16   claiming joint employment between the two operations, you are

17   aware of that, right?

18   A    Yes, I am.

19   Q    The Moody Petroleum and the South Dade Amoco when it was

20   opened, before it was closed, were they owned by one or two

21   corporations?

22   A    Two different corporations.

23   Q    Did they have the same ownership?

24   A    No.

25   Q    Did they combine together in some joint way to serve some

1   joint public, other than just the dispensing of gasoline?

2   A    No.

3   Q    Now, you responded to Mr. Marban's questions talking about

4   the Department of Labor claim.  Was the extra work at a

5   different corporation, at a different location, was the decision

6   to let her run the food concession at Moody before or after that

7   Department of Labor decision, you received that Department of

8   Labor decision?

9   A    She started after.

10  Q    At any time during Doris Berrocal's employment, at Dorcla,

11  Dorcla and Moody, the closing of Dorcla, ending at Moody until

12  the day she was fired, did she ever make any requests for you to

13  pay her overtime?

14  A    Never.

15  Q    Never?

16  A    Never, never.

17  Q    When was the first time you became aware that she was

18  claiming overtime?

19  A    When I was served the lawsuit.

20  Q    You were served with the lawsuit before or after she was

21  fired?

22  A    After.

23  Q    Let's talk a little bit about why she no longer works for

24  Moody.  We know she no longer works for Dorcla because Dorcla

25  closed on May 31, 2006?

Ede - Cross - Dormoy                                    58

```
 1    A    Correct.

 2    Q    Moody still operating, right?

 3    A    Still.

 4         MR. MARBAN:  Objection, on the basis of relevancy.

 5    The reason why she ceased to be employed.

 6         THE COURT:  Overruled.  It goes to motive and bias.

 7    Q    Doris Berrocal had worked for you for many years, right?

 8    A    Yes.

 9    Q    Tell the jury why she no longer works for Moody?

10         MR. MARBAN:  Objection, can we have a sidebar on that?

11         THE COURT:  Okay.

12         (Whereupon, the following a sidebar conversation was

13    held.)

14         MR. MARBAN:  He is going to elicit testimony to prove

15    that my client is a bad person.  That is going to cause undue

16    prejudice for the jury.  The reason why she was terminated

17    doesn't really prove any of the issues in the case.  It is

18    irrelevant, why she was let go.  She may have motive to

19    retaliate, that is really irrelevant.  The issue is how many

20    hours she worked and what she was paid for.

21         THE COURT:  Whether she is a credible witness.

22         And the relationship between these two and the

23    circumstances of her termination, reflect on whether she is a

24    credible witness.  Assuming you are going to call her as a

25    witness.  Do you intend to call her as a witness?
```

1           MR. MARBAN:  Yes, I do.

2           I just think the prejudicial value of that,

3   prejudicial effect outweighs any probative value.  I think she

4   is a bad employee.  What happens in a lot of these employment

5   cases, they bad mouth the plaintiff which creates prejudice for

6   the jury.

7           THE COURT:  What is your proffer?

8           MR. EDE:  I will not say she was a bad employee.  I am

9   going to say, just like she said in deposition, just like the

10  two independent witnesses said, that she was upset about being

11  fired.  That is what she was upset about.  She fabricates this

12  lawsuit to try to hurt my client, that is what it is about.

13          MR. MARBAN:  If that is all it is.  He is not--

14          MR. EDE:  I will not bad mouth the employment.  I have

15  not done it yet.  She was fired because she went nuts.

16          THE COURT:  I think that her basically her reasons for

17  leaving and her animus toward the defendant, are relevant to her

18  credibility.  So --

19          MR. EDE:  May I proceed.

20          THE COURT:  The objection is overruled.

21          (Whereupon, the following took place in open court.)

22          THE COURT:  You can proceed Mr. Ede.

23          MR. EDE:  Thank you, Your Honor.

24  BY MR. EDE:

25  Q    Mr. Dormoy, as I was asking you before, we know now that

```
 1    Ms. Berrocal is no longer employed with Moody Petroleum.  I want
 2    you to tell the jury why.
 3    A    She was let go on September 15th, 2007.
 4    Q    Why?
 5    A    For different reasons.
 6    Q    Tell the jury what the reasons were, please?
 7    A    They started about two or three weeks before she was
 8    dismissed.  The cafeteria has been loosing a lot of money and I
 9    told her, we have to do something, because I cannot be paying
10    for people to eat.  That is not correct.
11              And then she started having argument with--
12    Q    I'm sorry?
13    A    Argument with the manager.
14    Q    Argument?
15    A    Yes.
16              And, it was getting very ugly.
17    Q    It was getting very?
18    A    Ugly.
19    Q    Ugly?
20    A    Ugly.  She was treating the person with very bad names, so
21    I had to decide, that person had been with me for much longer
22    than she has.  Which one I am going to keep.  So I had to let
23    her go.
24    Q    When she was told to go home, was she upset about that?
25    A    Well, I wasn't there.  But the manager told her, that it
```

1    will be her last day.

2              MR. MARBAN:  Objection, move to strike.  Hearsay.

3              THE COURT:  Sustained.

4    Q    How did you know, tell the jury the circumstances of how

5    you knew what was going on, and how you made the decision to

6    tell the manager to tell her to go home?

7              MR. MARBAN:  Objection, he is eliciting hearsay

8    testimony.

9              THE COURT:  Ask him-- he can only testify as to what

10   he personally observed or knows.  So why don't you structure

11   your questions in that way.

12   BY MR. EDE:

13   Q    What did you hear or perceive on September 15th, 2007, that

14   caused you to make the decision to terminate her?

15   A    Manager called me on the phone, and he told me, she is

16   there screaming, saying bad things.

17             MR. MARBAN:  Objection.  Hearsay.

18             MR. EDE:  Your Honor, it is not offered for the truth

19   of the matter, it is offered for his impression and his decision

20   to terminate her.  The words don't matter.  It is what he

21   perceived at the time.

22             MR. MARBAN:  It could have been he was unavailable.

23   Unavailable as a witness, he could be called as a witness.  I

24   have no way to attack that statement because he is not a

25   witness.

```
 1              THE COURT:  Let me see you at the sidebar.
 2              (Whereupon, the following sidebar conversation took
 3    place.)
 4              THE COURT:  Hearsay.
 5              MR. EDE:  I thought it goes to state of mind.
 6              THE COURT:  How?
 7              MR. EDE:  He also -- my proffer is also going to be he
 8    will testify he heard her through the phone, that is what he was
 9    going.
10              THE COURT:  Why don't you just say, you called the
11    manager and what did you hear when you called the manager.  If
12    he heard her through the phone.
13              MR. EDE:  That is what he is going to say.
14              THE COURT:  That is not hearsay that is her
15    perception.
16              If you want, I will give a curative instruction based
17    on that, the limiting instruction, you are not to consider what
18    the manager said is true or not.  Do you want me to give that
19    curative instruction?
20              MR. MARBAN:  Yes.
21              THE COURT:  So when you elicit what the manager said,
22    I will give that instruction.
23              MR. EDE:  Do you want to do it first?
24              THE COURT:  I can go ahead and do it first.
25              MR. MARBAN:  Thank you.
```

1              (Whereupon, the following took place in open court.)

2              THE COURT:  Ladies and gentlemen of the jury, you are

3    going the hear some testimony concerning what this witness was

4    told by a manager.  I want to instruct you that that testimony

5    is hearsay.  You can't consider it for the truth of what the

6    manager said.  The only purpose for admitting that testimony is

7    to show this -- excuse me, this defendant's state of mind or the

8    reason that he took certain actions.

9              So, it is only to show the effect on him and his

10   reasons for taking certain actions and also to put in context

11   the rest of his testimony.

12             So, you are not to consider the statements made by the

13   manager for the truth of the matter.  I will instruct Mr. Ede,

14   not to go into those statements except as necessary to put in

15   context what he later saw or heard himself.

16             MR. EDE:  Thank you, Your Honor.

17             THE COURT:  What he did.

18   BY MR. EDE:

19   Q    Mr. Dormoy, let me move on.  Let me ask you, because I

20   believe you have already testified to what the manager told you.

21   Did you hear anybody else's voice other than the manager as you

22   were on the phone that day?

23   A    Yes, I did.

24   Q    Whose voice did you hear and what did you hear?

25   A    Ms. Berrocal was screaming and saying bad words and

1    screaming and screaming.

2    Q    What decision did you make at that time, September 15th,

3    2007?

4    A    I said, get her out.  Get her out of there right now

5    because you can't do that.  You are disturbing the whole

6    operations.

7    Q    Did she leave?

8    A    No.

9    Q    Why not?

10   A    Because she said she wouldn't wait a week to get her pay.

11   She need to get paid right now.  She was going to stay there and

12   call the police whatever.

13   Q    When you heard that statement, what did you do?

14   A    I told him pay her and let her go.

15   Q    As far as you know, did he pay her?

16   A    Yes.

17             MR. EDE:  That is all I have, Your Honor, thank you.

18             THE COURT:  Redirect Mr. Marban?

19             MR. MARBAN:  Yes.

20   REDIRECT EXAMINATION BY MR. MARBAN:

21   Q    Mr. Dormoy, you said that busiest times for the gas station

22   was during the hurricanes?

23   A    Yes.

24   Q    Do you remember the Hurricane Wilma in the year 2005,

25   October 24th, on a Monday?

1   A    I don't recall exactly when.  I remember the name.

2   Q    Do you recall that Mrs. Berrocal was working at the Dorcla

3   gas station at that time?

4   A    I don't think so.

5   Q    You don't think so?

6   A    She was supposed to work, yes.

7              MR. EDE:  Objection, beyond the scope of cross

8   examination.

9              THE COURT:  Overruled.

10  Q    She was working that night, correct?

11  A    She was on the schedule.

12  Q    And that night what happened was, that the hurricane picked

13  up at night and she could not go home that night?

14  A    Oh, yes, she did.  She didn't show-up.

15  Q    She left, went home?

16  A    She didn't go to work.

17  Q    She didn't go to work that day?

18  A    No, no, because she is afraid of hurricanes.

19  Q    So, who covered for her that night?

20  A    I don't recall whom.

21  Q    And did the person that covered, did that person stay

22  working all night to protect the store?

23  A    Wait a second, 2005, I-- we closed down.  I had hurricane

24  shutters.

25  Q    You think, you know or you remember?

1    A    I am pretty sure, I closed down, yes.

2    Q    Do you recall somebody staying over at the Eureka gas

3    station overnight?

4    A    During the hurricane, no.

5    Q    Do you recall that Mr. Berrocal also worked for you at the

6    Eureka gas station in the year-- 2005?

7    A    Who is Mr. Berrocal?

8    Q    Mrs. Berrocal's husband?

9    A    I didn't know his name was Berrocal.

10   Q    You didn't know her husband's name?

11   A    It is Hashad.

12   Q    Mrs. Berrocal, do you know she was married?

13   A    Yeah, Gustavo Hashad.

14   Q    Sitting here in the courtroom?

15   A    Right.

16   Q    Maybe you are right.  I assume his name was Berrocal also.

17        You don't recall her staying, working at the store the

18   whole night, staying at the store, guarding the store?

19   A    Who?

20   Q    The night of the hurricane.

21   A    Mr.?

22   Q    Mrs..  Mr. and Mrs.?

23   A    No, they didn't stay there.

24   Q    When she did work at the Moody-- at the Dorcla gas station,

25   you already told me that you were her boss, at that second gas

```
 1   station, correct?

 2   A    At Eureka?

 3   Q    Yes, sir.

 4   A    Her boss was her husband.

 5   Q    But her husband-- you were her husband's boss, you were in

 6   charge?

 7   A    Yes.

 8   Q    So, indirectly you were her boss at Eureka, correct?

 9   A    Correct.

10   Q    And you also mentioned that there were times when your own

11   family had to work to cover for other employees during their

12   shifts?

13   A    Yes.

14   Q    And, you kept the name of all your employees in a-- you had

15   a list that listed all the employees that you had at Moody

16   Petroleum, did you not?

17   A    Yes.

18   Q    And in that list, was your wife, your children listed as

19   employees?

20   A    No.

21   Q    Do you recall an employee by the name of Charles Ashton?

22   A    Can you repeat the last name.

23   Q    Charles Ashton.

24   A    I think so, yes.

25   Q    And do you recall that after Mr. Ashton left, no one
```

1   replaced him for about two months.

2   A    No, two months, impossible.

3   Q    I will show you what we will-- we have marked as

4   Plaintiff's Exhibit 9-A for identification.  It is an

5   impeachment exhibit.

6            If you go down the list to, you see the name Charles

7   Ashton, three lines up?

8   A    Yes.

9   Q    It states that his-- one column says, date of hire, 1/9/07;

10  the other column, D-O-T, is date of termination, do you see

11  that?

12  A    No.

13  Q    He was terminated on April 22nd, 2007?

14  A    Correct.

15  Q    And, who replaced him?  Do you know who replaced him?

16  A    I don't recall whom, but some of the other people.

17  Q    But you see that if you look at the date of hire for the

18  list of all your employees at Moody Petroleum, that you didn't

19  employ another employee until June 28th of 2007, two months

20  later.

21  A    Correct.

22  Q    So, there was no one to replace Mr. Ashton?

23  A    Well --

24  Q    For two months?

25  A    The other employees that were not doing forty hours.  So

1    they took over.

2    Q    But you had to have a number of employees and you already

3    told the jury that all your employees, you kept their names on a

4    list?

5    A    Yeah, but that was-- I don't remember exactly when I

6    started that.

7    Q    Well, it says here, the first one, date of hire, is

8    11/29/01?

9    A    Yeah, because that is the day I bought the gas station.  I

10   remember that one.

11   Q    So, according to this Exhibit 9-A, which is the Moody

12   Petroleum list of employees, you didn't hire anyone to replace

13   Mr. Ashton, at Moody Petroleum, after April 22nd, 2007, until

14   June 28th, two months later; isn't that correct?

15   A    I don't understand what you are saying here.

16        Two months after what?

17   Q    After April 22nd of 2007, you didn't hire anyone else to

18   replace Mr. Ashton until June 28th of 2007, two months later.

19   A    Correct.

20   Q    Correct?

21        If you go down the list to the last name Jose

22   Hernandez, do you see the date of termination 7/5/07.

23   A    Correct.

24   Q    You see if you go-- look through the exhibit, you never

25   hired anyone else after Mr. Jose Hernandez.

1   A    I don't know if this list is completely, is complete, I'm

2   not sure, I don't know.

3   Q    You previously told us, you kept a list of all your

4   employees, so you are saying that this list is not complete?

5   A    I don't remember.  You asked me for the people that were

6   dismissed during the time she was there.  Something like that,

7   right?

8   Q    Okay.

9          So, what you are saying that this list doesn't reflect

10  the name of the employees that were working?

11  A    Yes, it reflects most of them, yes.

12  Q    Are there employees that were working at your store, at

13  Moody Petroleum that are not reflected on this list?

14  A    I would have to check it.  I am not sure.

15  Q    Okay.

16          Do you know if-- do you know the name of the employee

17  who replaced Jose M. Hernandez?

18  A    I don't remember.

19  Q    And this list, if you look at the first name for Mr. Kahn,

20  that is the person you said Ms. Berrocal was screaming at,

21  correct?

22  A    Correct.

23  Q    Now, he is here for-- under the column says, date of

24  termination, it is open.

25  A    Correct.

1  Q    So this is not a list of employees that were terminated,

2  this is a list of all the employees?

3  A    That's correct.

4  Q    Isn't it true that after Mr. Ashton was terminated, Mrs.

5  Berrocal covered his shift at Moody Petroleum?

6  A    I don't recall any.  I don't.

7  Q    You don't recall that?

8  A    No.

9  Q    And, who covered Mr. Ashton's shift after he was terminated

10 or ceased to be employed on April 22nd, 2007?

11 A    I think it was the manager.

12 Q    One person?

13 A    Yeah.

14 Q    One person working the night shift?

15 A    Mr. Shallow, working night shift, I don't recall that.

16 Q    Isn't it true that you, at Moody Petroleum, you always had

17 two people working the night shift?

18 A    Night shift, what do you call night shift?

19 Q    I'm sorry, the afternoon shift from 4 o'clock to--

20 A    Usually two.

21 Q    To 10 o'clock.

22 A    Usually two.

23 Q    Usually two?

24 A    Usually two.

25 Q    So, when Mr. Ashton ceased to be employed on April 22nd,

1    2007, isn't it true that it was Mrs. Berrocal that covered that

2    shift?

3    A    I don't recall any.  I am telling you, it was the manager

4    that was covering.

5    Q    But you needed two people to work at night?

6    A    There is somebody else.

7    Q    So you assume somebody else covered, but you have no

8    specific recollection who covered for that?

9    A    I don't.  I don't know exactly.

10   Q    You also cannot tell us that after April 22nd, 2007,

11   another employee was hired to work at Moody Petroleum to work

12   that night shift because she is not reflected on the list.

13   A    I am not-- I might have changed.  The manager is doing

14   this.  I am not involved in, what you call it, taking an

15   employee from here, put it here and change to cover.  I am not

16   involved with that any more.  It is along time ago.

17            MR. EDE:  Can we come sidebar, please.

18            THE COURT:  Do you have an objection?

19            MR. EDE:  I would like to discuss it at the sidebar,

20   please.

21             THE COURT:  Well, I will let him continue his

22   examination and then we can discuss it at sidebar unless there

23   is an objection to a specific question.

24            MR. EDE:  There is an objection to the questions

25   surrounding this document.  Completely.

```
 1                THE COURT:  Okay.  We will go sidebar.

 2                (Whereupon, the following sidebar conversation took

 3    place:)

 4                MR. EDE:  I sent a request for production to the

 5    Plaintiff for documents and I specifically requested all

 6    documents of whatever nature taken from the premises of Moody

 7    Petroleum and Dorcla.  All documents taken from the premises.  I

 8    don't know the nature, origin of this document.  I don't think

 9    this document was produced to me.

10                MR. MARBAN:  I got this from you.

11                MR. EDE:  I looked at-- every response I have is, I

12    don't have any documents.  I don't know how you got that from

13    me.

14                MR. MARBAN:  I have a list with you attached some

15    schedules.  You attached this document as well.

16                THE COURT:  Is that in the initial disclosure?

17                MR. MARBAN:  No, I am using it as impeachment.

18                THE COURT:  I am asking you where you got it from?

19                MR. MARBAN:  In the response to the request.

20                THE COURT:  In response to a request for production?

21                MR. MARBAN:  I believe so.  I am not sure.  I can

22    check my file.

23                MR. EDE:  That is why.

24                MR. MARBAN:  It is in response to the request for

25    production, I remember perfectly.
```

1    MR. EDE:  I don't think so.

2    THE COURT:  You are not introducing it.  You have not

3    introduced it.  So you should not be publishing it.  You asked

4    him if he recognized it.  He said he did is my recollection.

5    MR. EDE:  I also have a problem with discovery

6    violation or potential.

7    THE COURT:  If it is a document that he got from you.

8    MR. EDE:  Then there is no discovery violation.  But I

9    don't think that that is the case.  Now, I trust him, I know him

10   for a long time.

11   MR. MARBAN:  I'm positive.

12   MR. EDE:  If that is the case, I apologize.  But I

13   think every response I ever did is, I don't have any documents.

14   MR. MARBAN:  It is attached to the request for

15   production.

16   THE COURT:  Where is the response for the request for

17   the production.  It is your exhibit.

18   MR. MARBAN:  Right.

19   MR. EDE:  It is an impeachment.

20   THE COURT:  I am saying.

21   MR. EDE:  This is my request.  Let's find his

22   response.

23   THE COURT:  Find his.

24   I am talking about your response to his request for

25   production.

1              MR. EDE:  Everyone I have.

2              THE COURT:  Which was an exhibit in the trial.

3              MR. EDE:  Everyone I have says, none.  Defendant's

4    response, that is none, none.

5              THE COURT:  See attached list.  All I am saying is,

6    names, that the defendant is employed for the period of time

7    plaintiff was employed.  See attached list.

8              MR. EDE:  It is not here.

9              THE COURT:  It is not attached to the exhibit.

10             MR. EDE:  I have known you a long time if you say,

11   yes, I will back off.

12             MR. MARBAN:  You know.

13             THE COURT:  I don't think he is accusing you of typing

14   it.  I think he was wondering whether your client stole that and

15   not turned over.  He doesn't have it.

16             MR. MARBAN:  I definitely didn't get this from my

17   client.

18             MR. EDE:  Okay.

19             Then I'm sorry.

20             MR. MARBAN:  Now that I am here, I will need to move

21   it in.  Something.  I have a case, everything produced through a

22   request for production is automatically authenticated.

23             MR. EDE:  Ask him-- I don't remember this.  Set the

24   predicate.

25             THE COURT:  I thought he did ask him.

1          MR. MARBAN:  He did.

2          THE COURT:  Let's repeat the predicate.

3          MR. EDE:  I'm sorry, Your Honor.

4          THE COURT:  But you can continue.

5          (Whereupon, the following took place in open Court.)

6    BY MR. MARBAN:

7    Q    Mr. Dormoy, Exhibit 9-A, the list of employees, that is a

8    document that you produced to me through your attorney, do you

9    recall that?

10   A    I remember doing one of those, yes.

11   Q    So you do recognize this document?

12   A    Yes.

13         MR. MARBAN:  Your Honor, I would like to at this time

14   move the document into evidence.

15         MR. EDE:  No objection.

16         THE COURT:  All right.  Exhibit 9-A will be admitted.

17         (So marked.)

18   BY MR. MARBAN:

19   Q    After July 5th of 2007, I know I asked you before.  I am

20   not sure I got the answer.  Do you know who replaced Jose

21   Hernandez?

22   A    I don't.

23   Q    Do you know whether it was Mrs. Berrocal who was covering

24   the shift of both Mr. Ashton and Mr. Hernandez?

25   A    I don't think it is possible you can cover both shifts.  I

1    don't understand what you are saying.

2    Q    Well, she had a morning shift and I am asking about the

3    night shift.

4    A    Usually when there is somebody missing or fired, until we

5    have somebody else, it was a manager was taking over.

6    Q    Didn't you need at least two employees working at night?

7    A    But that is not all the time.  If you don't have employees,

8    you don't have them.

9    Q    So your testimony is, that there were times when you only

10   had one employee working at night?

11   A    That's afternoon, yes.

12   Q    In the afternoon?

13   A    Correct.

14   Q    Do you remember this question and this answer, page 26,

15   line seven:

16        Okay, you mention something about head cashier.  Were

17   there more than two cashiers working?

18        ANSWER:  "Yes, yes.  In the afternoon there are two

19   cashiers because it is busy."

20        Do you remember that?

21   A    Yes.

22   Q    And isn't it true that you needed two cashiers in the

23   afternoon because the gas station was busy, the Moody gas

24   station?

25   A    Yes, I do.

1   Q    And, you're telling us that for a period of four months

2   that I have counted from, Exhibit 9-B, you only had one cashier

3   working the night shift even though it was busy?

4   A    I don't see where you get one.  You have to-- the manager

5   that could go, you have the other one--

6   Q    Okay.

7   A    I don't remember.

8   Q    So then you had other employees?

9   A    You had the girl, Rose.

10       MR. EDE:  9-A or 9-B?

11  Q    9-A, I'm sorry.

12       So then you do concede employees at times worked

13  double shifts?

14  A    Excuse me?

15  Q    So you are conceding then that employees worked double

16  shifts to cover for Mr. Ashton and Mr. Hernandez?

17  A    That was a manager, yes.

18  Q    Right.

19       And the manager was hourly paid?

20  A    No.

21  Q    He was paid a salary?

22  A    Salary.

23  Q    Isn't it true that all the employees of Moody got paid by

24  the hour?

25  A    Not the manager.  The manager was paid per salary.

1  Q    Just give me a second, please.

2        So then the manager would work more than forty hours a

3  week?

4  A    When he had to, yes.

5  Q    He wasn't paid overtime?

6  A    No, because he had contract.

7  Q    He had a contract to what, work on a salary?

8  A    Minimum 60 hours.

9  Q    Did the pay of your employees range from 6.50 to $10 an

10 hour depending on the amount of hours, depending on the

11 experience that they had?

12 A    Yes, except the manager.

13 Q    So then, according to you, the people that covered when you

14 were missing an employee would be the manager?

15 A    Sometimes I would.  But not very often.  Lately I am not

16 doing it.

17 Q    But back then, I am talking about back then when Mrs.

18 Berrocal was employed.

19 A    Yes.  Manager or the other employees that were not doing

20 more than forty hours.

21 Q    So but you never-- you never had a-- then the manager, did

22 you have any other employee that worked a double shift and

23 worked more than forty hours?

24 A    No.

25 Q    You said Mr. Ede asked you about, when the matter with the

Marban - Redirect - Dormoy                                   80

1    Department of Labor occurred and you believe it was in 1981--

2    I'm sorry, yeah, what year did-- 2001?

3    A    I believe it was 2000.

4    Q    Now, in this case, we asked you to produce any documents

5    related to the Department of Labor complaint.  Since you are

6    going to be stating in this case that you previously were

7    investigated by the Department of Labor, did you take any steps

8    to try to get a copy of that complaint that was filed with the

9    Department of Labor so we could show this jury today?

10   A    I did-- we did search on the Internet and could not find

11   out.  That's what I'm saying, I don't know which department.  I

12   remember receiving a paper asking about her, and I responded

13   that she was working for two corporations, and it was dismissed.

14   Q    Well, do you know of any other Department that investigates

15   overtime other than the Department of Labor?

16   A    I believe it was another Department of Labor.

17   Q    Well, did you make a FOIA request, a Freedom of Information

18   Request from the Department of Labor so you could have a copy of

19   that document here today?

20   A    What was the question?

21   Q    Did you make an attempt to get the records from the

22   Department of Labor, other than looking through the Internet,

23   did you make a formal attempt?  You had an attorney, did you try

24   to get those records from the Department of Labor?

25   A    No.

1    Q    When you answered in the response to the request for

2    production when I asked you in question number eight, do you

3    have copies of any complaints filed against you.  When you say,

4    none, you mean that none were ever made or that no, you didn't

5    have copies?

6    A    I didn't have copies.

7    Q    Okay.

8         I was fumbling through the deposition, I wanted to ask

9    you about salary and what other employees got paid.  You told me

10   that the manager was paid a salary, do you remember that?

11   A    Correct.

12   Q    Now, remember this question and this answer page 19, of

13   your deposition, line five:

14        QUESTION:  "How about other employees that worked

15   at the store, did they get paid by the hour also?"

16        ANSWER:  "Yes."

17        QUESTION: "How about the other employees that

18   worked at the store, did they get paid by the hour also?

19        Part of the same question.

20        ANSWER:  "Yes."

21        QUESTION: "What was the rate of pay, say in the

22   year 2004?"

23        ANSWER:  "It depends, whom?  Some people were

24   making $10, some were making 6.50, some were making seven."

25        Do you remember that question and that answer?

1   A     Correct.

2   Q     Isn't it true that all of your employees were paid by the

3   hour?

4   A     The manager, no.

5               MR. MARBAN:  That is all I have, thank you.

6               THE COURT:  Do you have any recross, Mr. Ede?

7               MR. EDE:  No, Your Honor.

8               THE COURT:  Thank you.

9               Mr. Dormoy, you can step down.

10              THE WITNESS:  Thank you.

11              (Whereupon, the witness was excused.)

12                    - - o o 0 o o - -

13  CERTIFIED to be a true and
    accurate transcript ONLY if
14  an original or signed copy.

15  s\Richard W. Barry
    Richard W. Barry, RPR
16

17

18

19

20

21

22

23

24

25